First case is two cases, cross appeals, United States of America versus Michael Gamble, 23-2105 and 23-2199. Is it Hallowell? It is Hallowell, Your Honor. Good morning, Mr. Hallowell. Good morning. Good morning, Your Honors, and may it please the court, Adam Hallowell for the United States. I'd like to reserve three minutes for rebuttal. Sure. The Pennsylvania cocaine trafficking offenses at issue here are serious drug felonies under Section 841, and this court should reverse the district court's ruling to the contrary. There are three sub-issues here, the Brown decision, ioslupane, and isomers. The last two involve chemistry, but they're purely issues of statutory interpretation. But to start with the first issue, the district court plainly erred under Brown, and that error warrants reversal under the applicable plain error test because the third and fourth prongs are met. That error strongly affected Mr. Gamble's sentence imposed below. These prongs, the third and fourth prongs, apply equally when the government appeals and when a defendant appeals, and so that's shown by the text of Rule 52, which doesn't distinguish between a government appeal and a defendant's appeal. So why don't you elaborate on prong three and how it substantially affects the government's interest, that this gentleman was sentenced to 150 months, and what was the government looking for? So the government asked for, first of all, the government asked for the enhancement, the statutory enhancement, to 851. Under 851. Right, which would have been a 10-year mandatory. Would have been a 10-year mandatory, but would also have affected the career offender guideline range. It's not disputed now he's a career offender. That would have been a 262 to 327-month range, very high range, and that's based on his serious criminal history. He has four prior Pennsylvania convictions for trafficking cocaine, as well as the serious facts of the fentanyl trafficking offense at issue here. So that's what the government requested. When we asked for the enhancement, we were seeking a guideline range sentence based on that enhancement as well. That's what we would have asked for had the court granted the enhancement, and I expect that's what we'd ask for on remand. So that's the serious offense here, and the record shows, at the third prong on the substantial rights, that the guideline range, which the court— But the district court here varied downward from a lower guideline range, right? Correct, yes. But the record shows that the district court looked strongly at the guideline range that it had calculated, the guideline range of 188 to 235 months, which is incorrect under Brown, and used that as the basis for her sentence. It's very clear from her explanation of her sentence at 281 to 283 of the appendix that she was looking at that guideline range and basing her downward variance based on that minimum range. She says Mr. Gambles asked for a variance to somewhere in the range of 90 months. She says that would be half of a downward variance from the 188-month minimum. She said I don't think a guideline variance of that extent is going to be—is warranted here based on the seriousness of his criminal history. So she went to 150 months, which would have been roughly half of the correct guideline range of 288 months. So given her reasoning, it's very difficult to see how she would have imposed the same sentence had she correctly calculated the guideline range. At the very least, all we need to show under the third prong is a reasonable probability of a different outcome. We don't need to show that she would have gone to the 262-month guideline minimum that was correct. Let's assume we accept your argument on prong three. Why don't you talk about prong four for a minute? Prong four is a similar effect here. The error seriously affected the fairness, the integrity, and the judicial reputation of the proceedings here. And that's first of all because, again, of this stark difference in the range. It's a range of six years, at least, difference between these guideline ranges. And it's also because this is exactly the type of error that the court's ruling in Brown was concerned about. The court said in Brown it would be absurd to say that technical changes in the federal drug schedules, which occurred years after a defendant's state predicate crimes, would be used to essentially undo the seriousness of those crimes as ACCA predicates or as Section 851 predicates. That's the reasoning that the Supreme Court gave in Brown. And it's clearly applicable here. Not getting this enhancement for Section 851 strongly affected his criminal history, which was serious. He only would have needed one cocaine trafficking offense to qualify for this enhancement, but he had three. And that's in addition to the large amount of fentanyl that he had, the firearm with the extended magazine that he had. This was a very serious offense, and the lack of the enhancement seriously affected the court's sentence here. It strikes me on Prong four that the shoe's usually on the other foot. Usually the government says, oh, there's no chance of meeting Prong four. And the government tries to minimize the Supreme Court's decisions in cases like Rosales-Morales and Molina-Martinez. Now you say, oh, wait, there's a big delta and we've got some dicta from the Supreme Court. That's going to be enough to meet Prong four. Is that, you know, if you win on Prong four in this case and it becomes precedent of this circuit, are you going to live with that ruling when it comes to criminal defense that come on Prong four and want to justify it through that same combo effect? We are, Your Honor, and that's because Prongs three and Prongs four look to the case-specific record in this case. You're trying to figure out the effect in this case of the error. There's no presumption, as we've explained in our third step brief, of prejudice at the third or fourth Prongs from a guidelines error. But the record here shows that this effect, which, again, it's a career offender range that is a strong difference and based on a statutory error as well, that shows an effect on this sentence that is sufficient to satisfy the third or fourth Prong. Let me tease this out a little again, though. The strongest cases that I'm aware of for a Prong four or even a Prong three mistake, especially Prong four for sending it back to do over, happen when the sum total of the mistakes occur at sentencing. And so we just redo the sentencing here. Here you've got a little, it's a sentencing issue, but you've got a little antecedent that's in play here with the denial of your 851 motion and you kind of now want to move that into sentencing, but that happened way beforehand. So doesn't that change a little bit that we aren't kind of just quite as automatically into a Prong four as we normally would be? Because at sentencing I can see that being a natural push. You know, Rosales-Morales says, hey, we'll just send it back for now at sentencing. But this is a little deeper. We've got to begin to evaluate an antecedent to the sentencing. You know, when that happens, isn't this the sort of thing that we just sit there and say, if it's so important to you, you had plenty of opportunity to raise this beforehand, you could have preserved it. We demand that of criminal defendants all the time, even with novel arguments. So this isn't a pure sentencing issue. What do you say to that? Yeah. It is a statutory issue in addition to a sentencing guidelines issue. And so we'd be happy with a ruling that threw that into the mix here, threw that into the factors that apply here. Certainly the 150-month sentence was closer to the 10-year mandatory that should have applied than the five-year that didn't apply. But, again, Rule 52 does not distinguish between the identity of the person raising the argument that's not preserved. So I have a question for you on that. I see that from the text you're saying that the text itself is not distinguished between the government and the criminal defendant. What are your strongest cases that support interpretatively not making a distinction? Well, Dickerson and Fumo from this court are the two cases that we would point to. And those cases have already crossed that bridge, really, without very much controversy, saying the government's substantial rights can be affected when an inappropriate sentence, an erroneous sentence, is imposed on a drug trafficker, a white-collar defendant, and that judicial fairness, judicial integrity can be applied in that way. So those cases are at issue here, and they support our plain-error arguments. But I'd also show on Prong 4, we have other arguments here, because the district court also rejected our preserved arguments on ioflupane. The district court incorrectly interpreted Pennsylvania law to say that Pennsylvania law covers ioflupane, unlike federal law, when Pennsylvania law excludes decocanized coca leaves or extracts of coca leaves, which do not contain cocaine or echonine. Just on the basis of that Pennsylvania text, that excludes ioflupane, which, as our expert declaration explained, is a separate substance from cocaine. It does not contain cocaine. Cocaine has been removed from it. It's an extract because cocaine is also an extract of the coca leaves, and yet ioflupane does not contain cocaine. So just squarely based on the text of Pennsylvania law, that exclusion applies, and Pennsylvania law is not overbroad based on that argument. Now, the district court did not address that decocanized proviso of Pennsylvania law. Neither has Gamble. So what's the difference between these terms of our decocanized and derivative? Is everything that's decocanized a derivative as well, or are derivatives different than the decocanization? Yes. Now, derivatives takes us more to the isomers argument, but a derivative, something that is derived from cocaine is a substance that's derivable, theoretically derivable, can be obtained through chemical reactions. And so a substance that is decocanized would be a derivative of cocaine or of coca leaves. So that is correct here. But because we have this specific carve out for a decocanized coca leaves, which do not contain cocaine or econeme, that's a signal that if it's a chemical substance that entirely lacks cocaine, then it does not fall under this Pennsylvania provision. And that's consistent with the Pennsylvania State Police's interpretation, how that has been interpreted under Pennsylvania law based on the, again, the declaration that we've submitted from the expert chemist. So not only based on the pure statutory interpretation here, which, again, the district court did not address this provision, but also based on the realistic probability test. Gamble has the burden under the Supreme Court's rulings and this court's rulings of showing that there is a realistic probability that Pennsylvania would prosecute an eye off. I mean, that's just that's just not our law. I mean, I mean, I mean, I may like that to be our law, but that that's that's just not our law. Well, this circuit has squarely rejected the notion of realistic possibility being used as a means of closing the gap to secure a categorical match. We have said instead that realistic possibility is a way of defeating a preexisting categorical match. There's a circuit split on this. We may be wrong, but that's not our law. Well, with respect, Your Honor, Sal Moran and Cabeda allow the realistic probability to be applied. Ndungu solves all that. We granted we granted on bonk on Ndungu. That was a key issue in Ndungu. It comes back and says, no, we're not doing that. Well, we'd still say based on Taylor, the Taylor case from 2022, that this is within the heartland. But Ndungu postdates Taylor. Yeah. Even regardless of that, Your Honor, we would point to the text of this law. There's a clear textual basis to exclude ioflopane under Pennsylvania law, separate and apart from the federal exclusion. And because ioflopane does not contain cocaine, it's a decocaine eyed extract. It does not qualify as a controlled substance under Pennsylvania law, as the state police has explained. And for similar reasons, as we've explained in our briefs, cocaine isomers, all 12000 structural isomers of cocaine beyond what federal law prohibits. Those also do not fall under the Pennsylvania statute, which does not even mention the word isomers. But the Slyman case is a little more open ended than the statute. Well, the Slyman case, Your Honor, refers to the eight optical or geometric isomers of cocaine. Exactly those isomers that are prohibited under federal law. The Slyman case is very clear when you read it in context. The defendant's experts, the government's experts below all said eight isomers of cocaine. And it's talking about these specific substances, optical or geometric isomers. And just to explain a bit what those are. So an isomer, if you have a Lego set, you can build anything out of all of those Legos. You know, if it has the same number of components, if it has the same items, they're all isomers. An optical or geometric isomer has part of the molecule going off at an angle in a specifically different way. You know, in the cocaine molecule, there are three different steric points where something can go one direction or another. So two times two times two, you get eight optical or geometric isomers. And those are closely related. Those are things that the chemists in Slyman were not able to determine from each other. Slyman says those eight fall within Pennsylvania law. Slyman does not say anything about the 12,000 other isomers. And there's no hook in the Pennsylvania statute, which doesn't even mention isomers, to bring all of those in. Thank you. Thank you, Your Honor. Good morning. Good morning, Your Honors. Renee Pietropalo for Michael Gamble. I'd like to reserve two minutes for cross rebuttal. Sure. With the court's indulgence, before we dig in, I'd like to offer a brief roadmap that presents two paths to resolve the government's appeal in Mr. Gamble's favor. Under the first and more narrow option, you can affirm under prong four of plein air review, because the government hasn't satisfied its heavy burden to demonstrate that the Brown timing error seriously affected the fairness, integrity, or public reputation of judicial proceedings, particularly where the 12-and-a-half-year sentence imposed exceeded the 10-year minimum 851 requires. To resolve this case on plein air grounds, the court must first reject the government's fallback argument that Pennsylvania never criminalized IU Fluepane. This court has recognized that it does in at least one non-presidential opinion, and in multiple district courts within the circuit have also agreed. The second option for you is more substantive. You can find that the Pennsylvania statute remains overbroad irrespective of IU Fluepane, because it sweeps in all isomers of cocaine. I'd like to begin with plein air, since that would allow you to write a narrow opinion, rely on persuasive authority already rejecting the government's IU Fluepane. This narrow path also allows you to leave for another day wading into isomers and dealing with Lego analogies. There is no published appellate court case has ever reversed a government's forfeited objection to a guideline calculation when that error did not result in the imposition of an unlawful sentence. And I want to be clear when I'm saying unlawful sentence. I'm referring to pre-Booker cases where it was a departure below the then mandatory guidelines. In post-Booker, I'm talking about imposition of sentence below a statutory mandatory minimum. So with the exception of FUMA, which we can discuss, the published appellate court cases in this area reversing to correct a government forfeited error have done so to correct unlawful sentences. And Dickerson is a case in point. There, the court imposed probation and the statute prohibited a probation sentence. It required a sentence of imprisonment. And with the court, what's animating those decision, and admittedly, there's not much discussion because most of these cases are pre-Morales-Martinez or, sorry, Rosales-Morales. And but what's animating those decision is the current concern that statutory Congress enacted these statutory minimums to take discretion out of the hands of judges. So judges are exercising their discretion, discretion they don't have. That impacts the fairness of a judicial proceeding. So your colleague on the other side suggested that we should view prong four of plain error totally symmetrically. And you seem to be suggesting that it should be asymmetric such that when the government wants to meet prong four, we have to look a little more strictly at kind of how – what was the sentence? Did the sentence land in an impermissible ground? Whereas when you typically come at your office and people who represent crippled defendants typically come, that doesn't cut it for prong four. You don't just walk off and say, oh, gee, it was in a permissible ground. Therefore, there's no prong four problem. You say, oh, my goodness, it's greater than it should be or something like this. Your colleague says since this test arrives from the rule, there's no reason for an asymmetry. Do you agree with my characterization that you're asking for something asymmetrical? And if so, what's your justification for that? I don't think we're asking for any asymmetry, Your Honor. Melinas Martinez expressly states that prong four is a case-specific and fact-specific inquiry. And in the ordinary case, it's the defendant's liberty interest that the error correction protects. And in that context, the Supreme Court says that permitting a risk that a defendant is going to do extra jail time, loss of liberty, that's the interest. What we're saying is – so the court in that case recognizes it's case-specific, and there can be countervailing circumstances that illustrate that the public reputation and fairness is going to be preserved absent error correction. And aren't you just kind of articulating asymmetry? I mean, you're talking about the defendant in general, liberty interest, which is going to always apply in a defendant's case. So if that's your basis, how are you not by definition suggesting that there's then going to be a different standard or set of factors every time we're looking at the government as opposed to the defendant? So there is some inherent asymmetry. It's how the test applies. And the defendant in the ordinary case is entitled to the presumption that's articulated in the Supreme Court cases. The government has to show how the error – how it impacts judicial integrity, right? And so they're saying 851 is intended to make sure that drug traffickers get substantial sentences. So right now we point to the fact it's a legal sentence. He's sentenced above the statutory minimum that applies had 851 applied. Keep going, sorry. And then the sentence captures recidivism through criminal history, through offense level, through the crime for the career offender enhancement, Your Honor. So I just want to ask, too, about you're leaning heavily on the legality of the sentence here, and I'm sympathetic to that point. And I raised it, however, in a separate case yesterday with a colleague in the public defender's office in a different case. And the answer there was that, well, regardless of the legality of a sentence under the statute, it's very important that the district court go first, start by going through and showing an accurate understanding of guidelines and how they work and going through the whole reasoning process step by step and having an accurate view of the law in total and how it works. And now today we're saying that it has to do with the bottom line sentencing. So which is correct? Is it getting things properly as a legal matter, an analysis matter, step by step, which would not be the case here post-Brown, or is it just looking at the totality of the sentence? And if it's still fine and lawful, it's all good if the district court's analysis was faulty. The defense counsel's articulation of the test was completely proper and accurate yesterday. It correctly articulated the Supreme Court precedent in this area. What I'm suggesting is the test is case-specific and fact-specific. And here it's not that I'm leaning on the fact that it's an unlawful sentence. The question here is would leaving the sentence in place impact the public reputation of judicial proceedings? And how would it if the statutory limits are complied with, the recidivism was fully factored into, and if we think about the error that we're correcting, this application of 851, we should remember 851 is available in about 33% of drug trafficking cases. Only about 4% ever are sentenced under 851. If one issue, though, is how we apply separate statutes like the Armed Career Criminal Act, sentencing enhancement that Congress decided to enact, what is your response to the suggestion that maybe preserving that law and making sure that an accurate understanding is brought into a calculation is important to the institutional integrity of the system, in addition to all of the other specific factors that you're talking about? Isn't a correct understanding of statutory law and how it applies to a state offense, which the Supreme Court was addressing in Brown, necessarily important to institutional interest of the government in preserving safety, security, institutional respect, deterrence? Sure. Understood, Your Honor. But here again, what the government's complaining about is an ordinary guideline error. I haven't been able to uncover a single case where the government was able to prevail on plain error under those circumstances. If you agree with us, you'd be in good company. There are two cases that I cited in my briefs, Deed and Coyle, where a court found the government just couldn't meet its burden at prong four. I mean, I guess this is what I'm hearing. I asked you about asymmetry. Judge Mascot asked you about asymmetry. You kind of don't want to say it's asymmetrical, but I don't know why you aren't leaning into it. Why don't you just say, yes, empirically it may be a case-by-case thing, but yes, it will be because there's a huge difference. One involves the loss of individual liberty. One involves an institutional concern that's borne by the public at large. I mean, I'm not buying the notion that pragmatically the results won't be asymmetrical under prong four. I think that under your view they will be. But I don't know why you aren't leaning into it. Just say, hey, look, it's an individual loss of liberty. That's huge versus just a guideline range in the range that the government can already get. So, I mean, if you don't want to lean into it, that's fine. But you've heard from two judges that are kind of saying, I think, you know, that's kind of how we take it. I think the effect rate is an asymmetry. I think I was misunderstanding the question. It's a procedural versus an outcome thing? Exactly, Your Honor. So, yeah, the effect is different, and the Supreme Court applies this presumption at prong four because of exactly what you say, which is a liberty interest that the government doesn't have in this case. So, perhaps I should move on to the IE plupain. Why don't you touch on the FUMO opinion first? I'm sorry? Why don't you touch on the FUMO opinion? Oh, the FUMO opinion. Thank you, Your Honor. FUMO is very different. It was not an ordinary guideline miscalculation. The court actually identified the error as the district court's refusal to resolve a disputed loss calculation because the judge said it seemed too complicated, it's going to take too much time. And so there, what we're talking about is a judicial abdication of its role. And so in that context, you can see how the judicial proceedings, the integrity of the judicial proceedings is impacted. So FUMO doesn't require a different result here, and you don't need to overturn or touch FUMO. It's very different. It's not the ordinary guideline calculation. And so then turning to IE plupain quickly, touching on some of the questions that were asked already. The Pennsylvania statute is broad. It criminalizes any derivative of the cocoa leaf. The parties agreed below and agree here that IE plupain is a derivative of the cocoa leaf. Decoconized cocaine or extracts, I'm sorry, decoconized cocoa leaves or extracts of the cocoa leaves, you're removing cocaine through the process of extraction. Because IE plupain was never in the cocoa leaf, it can't be removed through the process of decoconization or extraction. It's a derivative. It's created in a lab through a series of chemical reactions from the cocoa leaves. So derivative is very different. It's not an extract. It's not equal to extract. It's not equal to decoconization. And again, I need to resolve that in this case. In order for me to prevail at prong four of plain error, you do need to reject the IE plupain argument. But you've done that already in United States versus Kareem Murphy. It's an unpublished opinion, Judge Fitzhugh, on the panel. And I understand it's persuasive authority. But I can point you to more persuasive authority. The Supreme Court, in the Brown opinion, acknowledged Pennsylvania's overbreath based on the majority opinion, acknowledging Pennsylvania's overbroad based on IE plupain. And they cite Eastern District of Pennsylvania, United States versus Myrick. There are other opinions within the circuit saying the same thing. This court recognized that the materially identical language in the New Jersey statute was overbroad because it sweeps in IE plupain. That's Martinez versus Attorney General. And if there's any doubt, the federal statute proves the point. Before 2015, the federal statute had materially identical language sweeping in any derivatives. And they had that same exception for decoconized cocoa leaves and extracts. If that exception included IE plupain, there would have been no reason for the federal government, for Congress, for the DEA to go through formal rulemaking to explicitly remove IE plupain from Schedule 2. And that's what they did in 2015. If I could, in my remaining time, turn to Mr. Gamble's cross appeal, this court should take the opportunity to address what's an important issue with broad implication for plea negotiations and rule for a factual statement in a plea agreement to count as a stipulation that an offense other than the offense of conviction will determine the Chapter 2 guideline. The plea agreement itself must show that the parties understood and agreed to that fact. And that rule follows necessarily from the guidelines, text, and structure in cases interpreting the guideline, from the fact that the ordinary and legal meaning of the word stipulation, and from the fact that we're interpreting a plea agreement. And due process principles require that we interpret these against the government. It sounds like you're kind of wanting a match words test. I mean, that plea agreement says acceptance or responsibility. And that's a wide net. You know, that's a really wide net. For count three. Acceptance or responsibility for the conduct charged in count three, Your Honor. Respectfully, Braxton and a Ninth Circuit 2025 opinion in green, which I cite in the reply brief, they're my best cases for this. They make plain that for a stipulation to count as a stipulation in a plea agreement to a more serious offense, it's not just conduct, you have to be admitting mens rea too. So here we have I'm admitting the conduct, I'm admitting the possession. And Mr. Gamble makes clear at appendix page, I believe, 221. I understand the concept of constructive possession requires me to take responsibility for the gun because someone else had it. But he's never admitting knowing that the gun was present or having the ability to exercise dominion and control over it. That's the mens rea required for constructive possession. It's just like Braxton. It's just like green. Green is admitting to count one count. And the court says. You know, here's the thing. Like, I get it. But Braxton didn't use the buzzword acceptance responsibility, did it? Did it did the agreement in Braxton use the word acceptance responsibility? I think we need to read the entire agreement and we do read it strictly. We do read it literally against the government. And it says accepting responsibility for the conduct charge. Yeah, but but acceptance responsibility, like the whole point of accepting responsibility, at least as I understand it, is to save the government kind of at an early stage, the burden of putting together a case and doing all of these other things. And if you want to begin to say, oh, I accept responsibility for this element of a crime or this part of a crime or something like this, that's a different form of acceptance of responsibility because then the whole case still has to go forward with the remainder. And so I didn't think that Braxton. I mean, maybe I'm wrong, but I think we're in a place where acceptance of responsibility is kind of a big word. And I didn't see that. I don't recall that in Braxton. Maybe I'm wrong. Respectfully, Your Honor. The ordinary application rules of the guidelines require that the chapter two offense level be calculated by the offense of conviction. And to trigger an exception, again, you need a stipulation in a plea agreement. So Braxton is saying it's not enough just to admit these facts. You have to admit there it was like shooting at a marshal. That wasn't enough to show that the defendant acted with the requisite intent. And it's not enough here. Accepting responsibility for conduct is not the same as accepting that this offense is going to be used to supplant the ordinary rule that the 2D 1.1 guideline is going to apply. And the parties, this is actually standard language in the Western District of Pennsylvania. What they're contemplating by using that language is that 2D1 is the guideline and count three that you're accepting responsibility for is going to be used as a specific offense characteristic. You're getting a plus two under the 2D1.1 guideline because you had a gun in connection with this offense. That's the ordinary understanding that the parties put to the terms of that plea agreement. And if there's any ambiguity, we're required to read that ambiguity against the government as the drafter. They're completely capable of putting that language into an agreement. They did in the paragraph C2, they say, we're going to stipulate to type in quantity for purposes of calculating 2D1.1. They could just as easily say, we're stipulating to count three for purposes of triggering the exception in 1B1.2A. Thank you. Four brief points, if I can. First, on Gamble's appeal, there's no limitation in the language of the plea agreement either to the actus reus as opposed to mens rea or to just calculating offense characteristics as opposed to other parts of the guideline. The plea agreement says he acknowledges responsibility for the charged conduct and agrees it may be considered in calculating the guideline range. That includes determining which guideline applies off the bat. And all of this, as we've explained in our briefs, is irrelevant because the court didn't use either of these guidelines. It used the career offender guideline range. Turning to our appeal, this is the first time Mr. Gamble has raised the explanation that something can be an extract but no longer be an extract after chemical reactions apply to it. And that contradicts the definition of extracts that we've offered in our brief. Something is an extract if it's obtained from a drug or a plant substance and it maintains the similar active principles of it. And that's true of Ioflopane in addition to cocaine. Ioflopane still has the active principles that allow it to interact with neurotransmitters in the brain. That's why it's useful in medicine. So in order for you to have a decocainized extract, it needs to remain an extract even after you decocainize it. And so that's why cocaine is the extract from coca leaves. Ioflopane is the decocainized extract. It's an extract that does not contain cocaine or coca leaves. And again, that's consistent with the state police's interpretation of this law. Their declaration says they would not report this as a controlled substance or any other coca leaf derivative that does not contain cocaine. And that opinion of a state agency is worthy of deference under Pennsylvania law, again, under the cases that we cite in our brief. And the unpublished opinions that Gamble has referred to, those are all dicta in scenarios in which, like Brown, the cases were involved pre-2015 prior offenses. Those issues were not litigated. I'm not aware that there was an expert declaration as there was below. That includes the opinion from last fall. Here, this issue is squarely presented. It's preserved. This court should rule on the Ioflopane. As for the realistic probability test on Ioflopane, Ndungu still maintains an avenue for the realistic probability test here because it says the test applies when the elements of the state crime and the federal offense are identical. And they are identical here because both federal and state have this similar decocainized coca leaves exception that maps directly onto the federal exception. And the fact that the feds changed the law in 2015 to expressly provide an exception for Ioflopane, possibly in a belt and suspenders avenue, can't change the meaning of Pennsylvania law that the state police accept. Finally, Judge Mascott, as you said, at the fourth prong, these ACCA 851 career offender offenses, they are important to the system. This is a very broad effect on the sentence that Mr. Gamble could have received here. And overlooking this error would impact judicial fairness. On that point, however, if we disagree with you that there are symmetrical interests and we find there's an asymmetry because liberty interests get a thumb on the scale, should we decline to reverse here? What's your best argument under a construct where we find there to be asymmetry in the defendant to have a stronger interest? Well, I'd say that there is a very strong impact on the defendant here. Liberty interests can't be irrelevant to the fairness or the integrity of the system, even when the government is the one appealing. And because this is a case where there's a very strong, almost six-year difference in the guideline range and a five-year difference in the statutory range, that goes directly to the purpose of this drug recidivist enhancement, as explained by the court in Brown. This is more than simply a two-level offense level range. This is something that goes to something that Congress and the Sentencing Commission thought was an important part of the system, serious sentences for drug recidivists. Thank you. Thank you. On the plea agreement matter, Your Honor, this, I submit, is an atypical case where the record shows the non-career offender range actually exercised some gravitational pull. The district court said, I understand we're engaging in this exercise of calculating the non-career offender range because defense counsel repeatedly and explicitly tethered all of his downward departure and variance arguments to the non-career offender range. And then she sentenced Mr. Gamble within what she believed to be the correct non-career offender range. If we were standing here and the judge had imposed a career offender range sentence, well, I submit we wouldn't be standing here if that were the case. That's why the fact that the career offender was the final range, that doesn't make the error harmless. We can establish a reasonable probability, a likelihood, that if the judge were aware the non-career offender range were lower, she might have buried lower. So, you know, this is an interesting argument, but it strikes me as very interesting. I'll call it gravitational pull because I think that's a good way of thinking about it. But the government kind of makes the same gravitational pull argument when it tries to beat prong three with respect to the 851. And so if we're going to engage in a gravitational pull analysis, doesn't that make it easier for the government to then say, oh, the gravitational pull of moving things up would kind of pull the sentence up, too? And hence, we've got a material thing. It seems like if you say, oh, hey, gravitational pull down, it defeats prong three. Wouldn't kind of inverted gravitational pull up also defeat prong three or satisfy prong three? Right. I'm not running away from my argument, which was that at prong three, we're talking about substantial interest. And when it's the defense, it's the defendant's substantial interest in liberty versus when it's the government. The government has to identify substantial interest. Putting all that aside, I think we can accept arguendo that what you just said, Your Honor, is correct, whether it's the government or whether it's the defendant, that the gravitational pull that the guidelines exercise is meaningful. That's why I think prong four is the right answer. That's why you focused on prong four is your lead argument. Exactly, Your Honor. It just makes more sense to focus and just don't speak on prong three because we don't need to. Prong four is where the action is in this case. So one final thing to say about this, the government is saying the career offender range is the reason you shouldn't exercise your discretion. I'd like to submit there's a reason you should exercise your discretion to notice this error. And that's because most cases, as you know, 99 percent, I think, resolve by plea. Of that, a large percentage are going to resolve by plea agreement. When there's a plea agreement, typically defendants have to waive their right to appeal. So there's likely not going to be soon before you another case where you're going to have an opportunity to speak on how a plea agreement can articulate a stipulation that an offense level, other than the offense of conviction, should be the controlling offense level at chapter two. So it's critically important that defendants, when they're entering into pleas and plea negotiations, know what they're bargaining away. They shouldn't just fall into a waiver, which is what happened here. And we know that because the government concedes nobody knew 2K would result in the higher range until sentencing, which is eight months after Mr. Gamble executed this plea agreement. If the government wanted to displace that ordinary rule that 2D would be the guideline, it should have said it. That factual statement, I mean, Nathan bears this up, too. We're asking for you to issue an opinion that essentially says the text means what it says. That for a factual statement in a plea agreement to be a stipulation that specifically establishes a more serious offense and not the offense of conviction is going to be the controlling guideline. The plea agreement needs to say that. So we're asking that the court affirm on the 851 and rename for the procedural guidelines error. Thank you. Thank you. Thank you both for your arguments and your briefs. We'll take this.